### SEIFERD v. MEYER.

(Supreme Court, Appellate Division, Second Department. April 15, 1904.)

1. ATTORNEY AND CLIENT—INVESTMENTS BY ATTORNEY—NEGLIGENCE.

In an action by a client against an attorney for damages because of the negligent investment of her funds by defendant, evidence considered, and *held* insufficient to support a finding that a written agreement for the loan purporting to be executed by plaintiff was forged by the defendant.

Appeal from Trial Term.

Action by Rose Seiferd against Maurice Meyer. From a judgment in favor of plaintiff, and from an order denying a motion for a new trial, defendant appeals. Reversed.

Argued before HIRSCHBERG, P. J., and BARTLETT, JENKS, WOODWARD, and HOOKER, JJ.

Ira Leo Bamberger (Henry L. Scheuerman and John F. McIntyre, on brief), for appellant.

Raymond C. Haff, for respondent.

HIRSCHBERG, P. J. The purpose of this action is the recovery of a sum of money which the plaintiff charges the defendant with negligently investing for her. The defendant is an attorney at law, and was acting at the time of the investment under the authority of a power of attorney executed by the plaintiff. The investment was. made upon the security of the promissory note of the theatrical manager, Oscar Hammerstein, payable on demand, bearing his wife's indorsement, and accompanied with an assignment of the box-office receipts of two theaters in the borough of Manhattan, then under his management. There would be little, if any, difficulty in affirming the judgment and order if the verdict rested solely upon the character of the investment, but the defendant asserted upon the trial that the loan

was made with the plaintiff's knowledge and express. approbation, and that a written agreement to the transaction was executed by her with Hammerstein. This she denied, asserting that her signature to the agreement was forged by or on behalf of the defendant, and the evidence on this contention seems to me to so fairly preponderate in the defendant's favor that I am constrained to the conclusion that the verdict was the result of some misconception, bias, or prejudice on the part of the jury.

The plaintiff is one of four sisters for whom the defendant appears to have transacted business many years without complaint or cause of complaint, save in the present instance. The business included the conduct of litigation, as well as the investment of funds, and it was established beyond question that the sisters were in the habit of signing each other's names to the law papers, and even to bank checks. The defendant testified that Hammerstein's application for a loan, and the nature of the security he proposed to furnish, were fully and fairly explained to the plaintiff by him, and that she agreed to the loan of the money upon condition that a bonus of $100 be paid by the borrower, to which the borrower assented; that he (the defendant) thereupon caused the written agreement to be prepared, to which reference has been made, embodying the terms of the transaction, and which was executed by Hammerstein on October 6, 1897, together with the note and the assignment of the box receipts; that the agreement so executed by Hammerstein was handed by the defendant to the plaintiff to sign in his office on the following day, on which day she came there with her sister Mary for that purpose; that it was signed with the plaintiff's name while he was engaged in consultation with another client in an adjoining room; and that it was then delivered to him by the plaintiff, and remained in his possession until some time in the spring or summer of 1901, when his power of attorney was revoked by the plaintiff, and this document, with the plaintiff's other papers in, his possession, was turned over to her new attorney, her present counsel.

The plaintiff and her sister Mary denied knowledge of the agreement, and denied that either had signed the plaintiff's name to it. In the voluminous record of the trial may be found corroborating evidence on either side of the issue of fact thus presented, but the expert evidence offered established beyond question that the signature of the plaintiff is in form in the handwriting of her sister Mary, and, if it be genuine, the inference is inevitable that it was legitimately appended to the paper by Mary on October 7, 1897, at the defendant's office, in the plaintiff's presence, and with her sanction and consent. The theory of the plaintiff upon the trial and upon this appeal is that the signature was forged by the defendant or in his office by some one in his employment, and that by mischance an indorsement of a check written by her sister Mary in the plaintiff's name, then in the defendant's possession, was used in making the necessary simulation. There is no doubt that checks with indorsements of the plaintiff's name so made by her sister were at that time among the papers in the defendant's possession, and in this connection the evidence given at the trial by Mary on the subject of her use of the plaintiff's name is of some significance, as

bearing upon the value to be attached to her denial of the genuineness of the signature in question.

"By Mr. Haff: Q. Did you ever sign checks for Rose Seiferd? Did you ever sign 'Rose Seiferd' to checks? A. No, sir; not to checks. By the Court: Q. To anything? A. No, sir; she does her own writing. Q. Did you ever sign her name to anything? A. No, sir; never did. No occasion to do it. By Mr. Scheuerman: * * * Q. Now, don't you know—— Haven't you at some time or other indorsed Rose's name to a check that has been given to you? A. No, sir. Q. Or receipt or letter, or anything of that kind—indorsement on a bond? A. No, sir. * * * Q. * * * Now, don't you think you have indorsed checks in the name of Rose Seiferd, possibly? A. Well, that may— * * * Q. Haven't you cashed checks for her, where you have taken the check and given her the money, and then indorsed her name? A. That may have been years ago. Q. That is what I am speaking of. Now, take in 1897— Don't you think possibly that in 1897 you may have signed her name to a check? A. Oh, I may have, certainly."

The plaintiff's counsel asserts in the brief presented on this appeal that the probability is that the signature of the plaintiff to the agreement was written by one of the defendant's clerks. The counsel was himself a clerk in the defendant's employment at the time of the occurrence, and he testified at the trial that the defendant asked him to sign the plaintiff's name to the agreement, but that he refused to do so—not that he was asked to imitate her signature, but that the defendant claimed the right to sign the name by virtue of the power of attorney which he held; and the witness based his refusal upon the assertion that such a power could not be delegated.

The amount of the loan, exclusive of the bonus, was $2,000. Hammerstein failed soon after the loan was made, but payments have been made by him from time to time, amounting in all to $700, and the money has been turned over to the plaintiff by the defendant. The money loaned was obtained from two mortgages belonging to the plaintiff, which were paid off in the fall of 1897; and in the monthly statement which was rendered by the defendant to the plaintiff under date of November 1, 1897, he charges himself with the amount of these mortgages, and distinctly credits himself with the amount of the loan in question as "Cash, loaned Oscar Hammerstein, on note and agreement." It thus becomes a settled fact in the case that the plaintiff knew of the loan on November 1, 1897, and that it was made on a note and agreement, but she claims that she understood that the words "note and agreement" meant that the money was loaned upon a mortgage. Why she so understood, she does not explain. Indeed, she testified that the defendant's authority was expressly limited to the investment of her money upon bond and mortgage, but several circumstances tend to greatly weaken the force of her claim in this regard. The power of attorney contains no such limitation; the verified complaint alleges that the defendant, under the authority conferred by the power of attorney, "invested, by way of mortgage and otherwise, all her money and property"; and it appears that on many occasions her money was invested by the defendant upon promissory notes with her knowledge and concurrence.

The plaintiff's counsel left the defendant's office and employment in November, 1900. The defendant says he was discharged. The counsel says he left voluntarily. In April following, the plaintiff decided

to change her attorneys; and she accordingly caused a written notice to that effect to be served upon the defendant, revoking his power of attorney, and directing him to turn over to her new attorney all her papers and documents, agreeably to which direction, as I have said, the Hammerstein agreement was shortly afterwards delivered, with other papers, by the defendant to the plaintiff's counsel.

The weight of evidence is with the defendant on the main issue, irrespective of the positive testimony on either side, because it is difficult to accept the plaintiff's theory that the agreement was forged in the manner in which she contends that it was. The theory requires credence to be given to several unlikely things. That a professional man, of good reputation, who had for many years, without wrongdoing, transacted business with a client, involving the annual handling and investment of thousands of dollars, should conceive the idea of committing a heinous and wholly unnecessary crime, without apparent adequate motive; that he should assign to a clerk, having no motive whatever such as commonly may be assumed to inspire criminals, the task of committing the crime in his service, and that such task should be unhesitatingly undertaken; that he should permit this crime to be so bunglingly done that, for the purpose of forgery, an undoubtedly genuine signature annexed to the power of attorney in his possession should be overlooked, and one heedlessly selected which had not been written by the person whose name was to be forged; that immediately upon the consummation of the crime he should serve upon the victim what must be regarded as the equivalent of written notice of its commission; and that upon demand he should deliver the evidence of the crime to her counsel, known to him to be inimical and possibly cognizant of the crime, because he had been asked, to some extent, at least, to participate in the transaction—these and other matters connected with them are surely calculated to challenge credulity, and certainly require strong and convincing evidence to justify their acceptance as the truth.

The alternative involves no necessary suggestion of perjury on the part of either the plaintiff or her sister Mary. So many years have elapsed since the investment that they might easily persuade themselves that the disastrous loan was made without their knowledge, the more readily since the principal party did not sign the agreement. An honest mistake in the giving of their testimony is quite within the possibilities. Nor is it intended in this opinion to decide that they are wrong in fact, and that the agreement was executed with their knowledge. The decision of that question must, of course, rest finally with a jury, which is both the constitutional and the best tribunal for its determination. But in view of the gravity of the accusation made against the defendant, the contradictory nature of some of the evidence, the improbabilities which have been pointed out, and other features of the case which it is not deemed necessary to comment on in detail, I conclude that a new trial should be granted in the interests of justice. The judgment and order should be reversed.

Judgment and order reversed, and new trial granted; costs to abide the event. All concur.